the broker, Dominick, the high and low price of the stock during each month in the year is given, except the month of April, in which there were no sales. From this statement it would appear that the average price at which the common stock sold during the year in question was between 47 and 48, with the par value of 50. In addition to that, the broker has sworn that to the best of his knowledge and belief the average price at which the common stock of the relator sold during said year was less than the par value of said stock. It is contended that this statement of the minimum and maximum price in each month is no proof of the average price at which the stock sold, because in that statement it does not appear how much stock was sold at the prices named. As I read the statute, however, the average price is to be determined by the different sales, irrespective of the amount sold upon the respective sales. For instance, if 100 shares be sold at 48 upon one day and 10 shares at 50 upon the next day, the average price for the two days would be 49. Any other method of determining the average price, reckoning the number of shares sold upon each sale, would present a rule too intricate for reasonable application. In my judgment, therefore, the proof offered and uncontradicted was sufficient to show that the average price of the sale of stock for the year was less than par.

[5] Our attention is called to the statement of the relator furnished to the comptroller prior to the hearing, in which it is stated by the treasurer that he estimates and appraises the common stock at $50 per share; "such estimates being based on the price at which small blocks of stock of the company have been sold." This statement of fact is not at all inconsistent with the fact, shown upon the hearing before the comptroller, that the average price of stock sales was less than 50. The question for the determination of the comptroller is not his judgment of the value of the stock, but a value determined by the arbitrary method of ascertaining the average price of stock sales during the year. If we are right in this conclusion the comptroller has improperly assessed the tax upon the common stock at 1½ mills, instead of three-quarters of a mill, and it follows that the determination should be modified by reducing the tax on the common stock one-half, and, as modified, the determination should be confirmed, with $50 costs and disbursements.

Determination modified, by reducing tax on common stock one-half, and as so modified, confirmed, with $50 costs and disbursements to the relator. All concur, except KELLOGG, J., who dissents.

---

### DOBBINS v. SYRACUSE, B. & N. Y. R. CO.

(Supreme Court, Appellate Division, Third Department. May 7, 1913.)

1. CARRIERS (§ 45*)—OBLIGATION TO FURNISH CARS—NOTICE—SUFFICIENCY.
    Where there is no statute prescribing the manner of offering property for transportation to a carrier, or the length of notice to be given of an intention to ship, and the carrier has no rule on the subject, and the courts have not established any rule, the court, in an action for a car-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

rier's failure to furnish cars for the transportation of perishable freight, must look to the facts in determining whether the order for cars, or the offering of the freight for shipment, and the notice given, are reasonable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 120, 123–128; Dec. Dig. § 45.*]

2. CARRIERS (§ 40*)—OBLIGATION TO FURNISH CARS—DISCRIMINATION.

A carrier must exercise reasonable care and diligence to furnish cars adequate for the transportation of freight, and not to discriminate in favor of one shipper, when the demand exceeds the capacity of the carrier and the anticipated and ordinary calls on it.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 120–122; Dec. Dig. § 40.*]

3. CARRIERS (§ 45*)—REFUSAL TO FURNISH CARS—QUESTION FOR JURY.

In an action against a carrier for its failure to furnish cars for the transportation of perishable freight, evidence *held* to support a finding that the demand for cars and the offering of the property for shipment were reasonable, so that the carrier, refusing to furnish cars, was liable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 120, 123–128; Dec. Dig. § 45.*]

4. CARRIERS (§ 66*)—CONTRACT TO FURNISH CARS—ACTS CONSTITUTING.

Where a shipper constantly gave orders for cars, and the carrier promised to supply them, there was a contractual relationship between the shipper and the carrier, and the shipper could maintain an action for the carrier's failure to furnish cars.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 221; Dec. Dig. § 66.*]

5. CARRIERS (§ 40*)—FAILURE TO FURNISH CARS—LIABILITY.

Where a shipper honestly attempted to procure cars for transportation of perishable freight, and the carrier refused reasonable demands for cars, and cars were furnished competing shippers, the shipper could recover for the refusal to furnish cars, and the fact that he had held the goods for speculative purposes was immaterial.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 120–122; Dec. Dig. § 40.*]

Appeal from Trial Term, Cortland County.

Action by Joseph Dobbins against the Syracuse, Binghamton & New York Railroad Company. From a judgment for plaintiff for damages and an extra allowance, and from an order denying a new trial, defendant appeals. Affirmed.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

W. S. Jenney and F. W. Thomson, both of New York City, for appellant.

Dowd & Dowd, of Cortland, for respondent.

HOWARD, J. The law requires, and it did at the time of the transactions in question require, that:

"Every railroad corporation shall * * * furnish sufficient accommodations for the transportation of all passengers and property which shall be offered for transportation at the place of starting, within a reasonable time previously thereto. * * * No preference for the transaction of the business of a common carrier upon its cars * * * shall be granted by any

railroad corporation to any one of two or more persons, * * * competing in the business of transporting property for themselves or others."

[1] No statute of the state, no rule of the defendant, and no decision of the courts prescribes the manner of offering property for transportation, the manner of ordering transportation, or the length of notice to be given beforehand of an intention to ship. Therefore we must look to the conditions surrounding each individual case in determining whether the order for cars, the offering of property for shipment, and the notice given are reasonable.

[2, 3] For many years before the winter of 1906–07 Dobbins Bros. had been engaged in the cabbage business at Homer and other points along the defendant's railroad. The defendant was thoroughly familiar with the traffic needs of the plaintiff's business, and of the cabbage business in general, for that was a cabbage section. It knew the rush season of the business. It knew the storage capacity of Dobbins Bros.' houses. The houses were located within 75 or 80 feet of the Homer station. In December defendant's agent made an inspection of plaintiff's (and, when I say plaintiff, I mean Dobbins Bros.) storage houses, and saw the cabbage, and was told that there were 3,000 tons to be shipped. The agent at that time promised to supply all the cars the plaintiff needed. The defendant knew the property was perishable. Most of it, the agent knew, was to go over defendant's lines to Wilson Bros. in New York.

The defendant did not require an order in writing for cars; it had never done so; it did not require a certain number of days' previous notice in ordering cars; it did not require the order to be made in any particular way. The parties dealt with each other informally, rather than by fixed rules; they had done so for many years. The defendant tolerated this informal manner of dealing, encouraged it, and participated in it until it had grown to be a custom on which Dobbins Bros. relied, and on which they had a right to rely. Following this custom, and relying upon it, Dobbins Bros. began to order cars in the usual way. The defendant did not supply them as fast as they were needed, and then the defendant would be told again that the plaintiff desired cars. The agent would promise the cars; would say he would do the best he could; would wire the division superintendent. He never rejected the orders. He never complained that they were not in writing, or were not formal. The defendant had ample and reasonable notice of the plaintiff's desire for cars, for the demand for cars was daily, persistent, urgent. The demand was not an "unexpected" demand, such as that cited in defendant's brief and referred to in Beal & Wyman, R. R. Rate Reg. § 262, but a constant, reiterated, expected demand; and it was not only expected, but the defendant was well aware that it must arise, and had for years arisen, from the nature of the business. The plaintiff seems to have exhausted every argument and resource and to have resorted to every device, to get cars, but without avail. He repeatedly and constantly importuned the Homer agents; he went to Cortland, saw empty cars there, and tried to get them from the Cortland agent; he twice wired Casey, the division superintendent, first on February 17th, then again

February 27th. His telegrams were urgent; they were almost suppliant. They read as follows:

"M. B. Casey, Scranton, Pa.: Cabbage loaded on cars. No orders to let them run. No cars to load more. How will we move two thousand tons on that service?                                      Dobbins Bros."

"M. B. Casey, Scranton, Pa.: We have orders West and South; trust you will give orders to let cars run and give us cars fast or stock will perish.
                                                "Dobbins Bros."

Casey admits having on hand sufficient cars for all the defendant's needs, although there was an unusual demand that winter for cars.

It is under these circumstances that we must measure the duty of the defendant to the plaintiff. The ordinary duty of the carrier is to exercise reasonable care and diligence to furnish cars adequate for the transportation of freight, but not to discriminate in favor of one shipper when the demand exceeds the capacity of the carrier and the anticipated and ordinary calls upon it. Strough v. N. Y. R. R. Co., 92 App. Div. 584, 87 N. Y. Supp. 30. The question as to whether the defendant did in this case exercise reasonable care and diligence in supplying cars to the plaintiff was submitted to the jury. It was eminently proper that it should be submitted to the jury, and their determination of the question against the defendant is abundantly sustained by the evidence.

[4] But the defendant contends that it cannot be held liable unless contractual relations are established. Without admitting this proposition to be true, it is sufficient to say that such relations were established. The plaintiff was constantly giving orders for cars. These orders were accepted; that is, the defendant promised to supply them. This was a contract.

[5] There seems to be very little substance in the contention, presented with so much assurance at the argument by defendant's counsel, that the plaintiffs were holding their goods for gambling and speculative purposes. It is easy to style any one a gambler who holds his goods for a better market. Within this meaning everybody who has products for sale is a gambler. The small farmer's wife, who keeps her dozen turkeys until the high prices at Thanksgiving time, is, in this sense, a gambler. Dobbins Bros. had a right to hold their cabbage for a good market. They made their money by the profits on their trade. But so far as I can discover, from reading the evidence, they made no attempt to hold their cabbage; they made every effort to the contrary. There was every reason why they should wish to sell it; there was no other way to make a profit. They certainly could not have contemplated, by the process of a lawsuit, "selling their rotten cabbage to the railroad," as the defendant puts it. To assume such a purpose is idle. The scheme would have been too uncertain, too hazardous, even for a gambler. Indeed, they were constantly clamorous for cars to ship away their cabbage; there is no escape from this conviction. They were anxious about it; they grew alarmed, almost frantic, as their loss grew more certain. Whether or not Dobbins Bros. were gamblers is immaterial to this court. Did they honestly attempt to procure cars, and were cars refused them? is the ques-

tion here. And were other competing shippers furnished cars, while they were denied to these plaintiffs? is also a question. Plaintiffs' moral attitude in handling cabbage helps not at all in determining either of these questions.

The plaintiffs' claim that Dobbins Bros. were discriminated against by defendant is not so well supported by evidence as is the plaintiffs' previous claim which we have discussed. There is sufficient, however, to warrant us in refusing to disturb the verdict on this subject. The evidence of Dewey, Litz, and Mourin shows that, while Dobbins Bros. were having so much trouble, they had very little trouble in getting cars. They adopted substantially the same custom in ordering cars as that followed by Dobbins Bros. So far as can be seen, there was no reason to take care of them and neglect the plaintiff.

If the defendant is responsible at all, the damages assessed are not extravagant. The evidence shows that the plaintiff suffered a much greater loss than the amount which the jury has awarded. The case was submitted to the jury on a charge without a flaw—fair, temperate, sound, correct in every particular, both as to the narration of facts and the statements of law.

As I view the case, Dobbins Bros. were wholly without fault, and the judgment should be affirmed, together with the extra allowance of costs. All concur.